MARY PARNES, executrix, &c., appellant,

*v.*

GNOME MANUFACTURING COMPANY, respondent.

[Decided February 9th, 1922.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Foster, who filed the following opinion:

"Complainants in this action seek the rescission of a contract for the purchase of stock, the repayment of $2,500 paid to defendant, under this contract, by the decedent in February, 1920, and they also ask to have defendant enjoined from prosecuting any suit to recover the balance of $3,500 alleged to be due on the price of the shares of stock purchased under this contract.

"The grounds on which relief is sought are—that officers of defendant by misrepresentations relating to its ownership of patents on a toy aeroplane and a doll's head; the amount of its unfilled orders; that the patentee of the aeroplane was then in its employ at a small salary; that Albert F. Bender, a lawyer of Elizabeth, was a stockholder and officer of the company; that no royalties were due or payable on the manufacture of the aeroplane, and that the company would issue twenty shares of fully paid common stock as a bonus; upon the decedent subscribing for sixty shares of its preferred stock; and, also, that these officers of defendant by the fraudulent concealment from decedent of certain facts, within their knowledge, respecting the number of shares of preferred and common stock then outstanding; the amount of its gross sales up to December 31st, 1919, and the fact that the cost of producing its products up to that date exceeded the amount of sales by about one-third; that its liabilities exceeded its assets; that the original subscribers to its capital stock had not paid their subscriptions; that the corporation was in fact insolvent, and was a losing and unprofitable

venture; induced Samuel Parnes, the decedent, to purchase the shares of stock mentioned. All of these misrepresentations and concealments are denied by the officers of the defendant and by its witnesses.

"In support of these allegations reliance is placed by complainants upon certain features of the bill and answer, upon interrogatories and the answers thereto; and on the books of the defendant and principally upon the testimony of Julius A. Parnes, a son of the decedent, and one of the complainants.

"From the record it appears that Samuel Parnes, a resident for years in Elizabeth, and a successful business man, bought this stock on February 17th, 1920, and died eighteen days later, on March 7th, and that he was ill for some days before his death.

"That he knew that a Mr. Conrad and the Balinski brothers, friends of about twenty years' standing, were interested in the company as stockholders, but not in its management; that he spoke to all of them several times about the business of the company before purchasing the stock, and asked the amount of their investment in it, and expressed his desire to own as much stock in it as Joseph Balinski, the largest stock owner, who had invested $6,000 in the company's stock; Mr. Parnes also expressed his desire to these parties to inspect the factory and to obtain a position in the company for his son, and also desired to enlarge the scope of the company's operations, according to ideas which he had obtained in Europe; and he further expressed his willingness to build a larger factory and rent it to the company. Some days preceding February 17th, accompanied by his son, Mr. Parnes inspected the factory, and it is on this occasion that it is testified to by his son that the misrepresentations were made by Mr. Cannon, the president and secretary of the company, and it appears from the testimony of Mr. Cannon, and from that of Conrad and the Balinski brothers, the only others present during this inspection and conference, which lasted about an hour and a half, that Mr. Parnes and his son were taken over the factory and shown the work that was being done; that they were made fully acquainted with the affairs and operations of the company,

and of its financial conditions, and of its need of money, that all of the books of the company were opened to his inspection and that he paid little attention to them, but that they were examined by his son; that decedent asked a number of questions about orders on hand; the business and financial conditions of the company; about the stock outstanding and about the number of shares each person held; and stated that he wanted to own at least as many shares as the largest stockholder had. These witnesses agree that Mr. Cannon and the others present fully informed Mr. Parnes and his son of everything relating to the company's affairs, including the amount of money it had in bank; and that it had debts to pay; that it could not go on with manufacturing for lack of money; that the company desired to sell more stock to obtain money to go ahead with other patents; and that Cannon then gave Mr. Parnes a pencil memorandum of facts relating to the company's affairs; and that questions were asked by Mr. Parnes and his son and answered by one or more of the others present.

"They further agree in their testimony that nothing was said or done to induce Mr. Parnes to become a stockholder; that he apparently was anxious to get his son in the business; and upon the understanding that the company would employ his son at $30 a week, Mr. Parnes announced he would pay $6,000 for sixty shares of the preferred stock, with a bonus of twenty shares of common stock, and that he then announced his willingness to take an active part in the business and give the company the benefit of his experience in the real estate and building business and offered to help out in the development of the aeroplanes, having patented one himself; and that he then also offered the use of his automobile to help the company in its business.

"From the testimony of Mr. Bender, the attorney of the company, it appears the same parties met at his office a few days later, in February, 1920; at this meeting, when the stock certificates were ready for delivery, Mr. Parnes was asked for a check for $6,000, and stated it was not convenient for him to pay the entire amount at that time, but that he could pay $2,000. Mr. Cannon then informed him that this amount would not meet

the bills the company owed, as they needed at least $2,500 for that purpose; which amount Parnes then paid and Bender wrote a receipt showing the details of the transaction and gave the original to Mr. Parnes and kept a copy for his files. Mr. Parnes then made inquiry about the control of the company and a new agreement pooling the stock of all parties was then signed by all of the stockholders [except one], including Mr. Parnes.

"As stated, practically all of these facts are disputed by Mr. Parnes' son, although he admits being present with his father and inspecting the factory, but he does not recall seeing Mr. Cannon give his father the pencil memorandum containing the list of stockholders and a statement of the company's financial condition. His father transferred to him ten shares of the preferred stock and he at once entered the employ of the company and remained with it for about three months; and his salary was unpaid for about six weeks, although other employes were regularly paid. Shortly after entering upon his work he claims he discovered from his own observation and from remarks of Mr. Cannon that many of the statements which he states were made to his father to induce him to buy stock were false, and that material facts relating to the company's affairs and to its financial condition had been concealed from him and his father by Mr. Cannon and the others present at their conference; he admits that during his employment he had free access to all books and papers of the company and reported his discoveries almost daily to his father; and that no action was taken by Mr. Parnes, after his son informed him he had been defrauded, to rescind the contract; it also appears that young Mr. Parnes did not complain to Mr. Cannon, nor to any one else connected with the company before or after his father's death that he had discovered that his father had been induced to purchase the stock through misrepresentation respecting it, or through the concealment of the real condition of the company's affairs. On the contrary, he continued on very friendly terms with Mr. Cannon, and on July 13th, 1920, some weeks after leaving the company's employ, he wrote Mr. Cannon that he was now working in New York, and added:

" 'Let me at this time express my sincerest thanks to you for your part in getting me this position; I shall try my hardest to do you justice. If there is ever an occasion where I can show my appreciation of your kind interest, won't you please call on me, as I assure you it will be a pleasure?'

"It seems incredible that this young man about twenty-two years old should write this letter months after he had discovered, as he now claims, that Mr. Cannon and others had defrauded his father out of $2,500; and at a time when he knew they were attempting to collect from his father's estate $3,500, additional as part of the proceeds of their fraud. It also requires something more than this young man's uncorroborated statement to justify one in believing his assertion that within three days after this fraud was perpetrated, and while $3,500 was still unpaid for the stock, Mr. Cannon was so indifferent to the consequences that he gave him free access to all the books and affairs of the company; and, in effect, informed him or allowed him to learn that all of the statements which Cannon had made to his father and himself to induce the purchase of the stock were false and fraudulent.

"Complainant's proofs are far from establishing that any of the misrepresentations and concealments complained of were ever made or occurred; and such proofs as they offer are completely overcome by the evidence on the part of the defendant. It is contended, however, that the stock certificates themselves are indicative of the fraud, because there is printed thereon the statement that the capital stock is full paid and non-assessable, when in fact it is not. Aside from the statement of Mr. Bender that this caption was a mistake due to his own act, as attorney for the company, in ordering a standard form of certificate from the stationer, it significantly appears by the proofs that Mr. Parnes never saw a stock certificate of the company bearing this caption until after he had agreed to buy the stock and gave his check for $2,500 on account of the purchase price; and this caption, therefore, could not, and did not, induce him to make the purchase of the stock. It also appears that Mr. Parnes was informed by Mr. Bender at or before the time he made the payment of $2,500, that the common stock which he received as a

bonus was more of a liability than an asset, and that some day he might be called upon to pay for it, and Parnes stated that he understood that to be the fact.

"It is further contended that at the time of this transaction, and, also, as a result of it, defendant had violated section 18 of the Corporation act by having issued and outstanding its preferred stock to an amount which exceeded two-thirds of its common stock paid for in cash or property.

"This allegation, like the others, is not supported by the proof, which shows one hundred and eight shares of preferred stock issued and outstanding and two hundred and twenty-nine shares of common issued, of which one hundred and twenty-seven shares had been issued for property purchased [patents or patent rights], and if the sixty shares of preferred included here be added to the foregoing, the proportion between the common and the preferred would still be within the statute.

"I will therefore advise that the bill be dismissed."

*Messrs. Kanter & Kanter,* for the appellant.

*Messrs. Gilhooly & Bender,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Foster.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK—13.

*For reversal*—None.